UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SID AVERY AND ASSOCIATES, INC. )
d/b/a MPTV IMAGES,            )
                             )   Case No.: CV 18-10232-CJC(JEMx)
                             )
                             )
        Plaintiff,           )
                             )
    v.                       )   ORDER GRANTING IN PART AND
                             )   DENYING IN PART DEFENDANT'S
                             )   MOTION FOR SUMMARY
                             )   JUDGMENT [Dkt. 94]
PIXELS.COM, LLC,             )
                             )
                             )
        Defendant.           )
                             )
_____)

I.      INTRODUCTION

        This is an action for copyright infringement regarding six vintage photographs that were posted to "print-on-demand" websites operated by Defendant Pixels.com, LLC ("Pixels").  (Dkt. 44 [First Amended Complaint, hereinafter "FAC"].)  Plaintiff Sid Avery and Associates, Inc. d/b/a MPTV Images owns copyrights to the images and asserts claims for copyright infringement, as well as claims for removal and falsification

of copyright management information.  (*Id.*)  Before the Court is Pixels' motion for summary judgment.  (Dkt. 95 [Amended Notice and Motion]; Dkt. 94-1 [Memorandum in Support, hereinafter "Mot."].)  Pixels argues there is no genuine dispute of material fact regarding its direct liability and that it is shielded from vicarious liability under the Digital Millennium Copyright Act's ("DMCA") safe harbor provision, 17 U.S.C. § 512(c).  For the following reasons, Pixels' motion is **GRANTED IN PART** and **DENIED IN PART**.[1]

## II.    BACKGROUND

Pixels operates several "print-on-demand" websites, including FineArtAmerica.com and DesignerPrints.com ("the Websites").  (Dkt. 101-27 [Plaintiff's Statement of Genuine Disputes, hereinafter "SGD"] ¶ 1.1; Dkt. 101-15 [Transcript of the Deposition of Sean Broihier, hereinafter "Broihier Depo."] at 20–22.)[2]  Unlike other platforms, Pixels does not simply allow users to print their own images.  Instead, it offers consumers the opportunity to purchase various products—including framed wall art, throw pillows, beach towels, phone cases, and tote bags—printed with images uploaded by its "contributors."  (SGD ¶¶ 1.1–1.10; Broihier Depo. at 110–112.)  Pixels denies that it "sells" these goods.  (*See, e.g.*, CSF at 1.)  Instead, it describes itself as a "platform" and "marketplace" for artists, photographers, and image libraries to sell their art to consumers.  (*See* SGD ¶ 1.1.)  Semantics aside, the parties do not dispute the basic elements of Pixels' business model.

---

[1] Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing.  See Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set for August 24, 2020 at 1:30 p.m. is hereby vacated and off calendar.

[2] "SGD" encompass both Pixels' statement of uncontroverted facts in support of its motion for summary judgment, (Dkt. 94-27), and Plaintiff's response, (Dkt. 101-27).  Citations to "CSF" refer to Plaintiff's "counter-statement of facts," (Dkt. 94-27 at 58–64), and Pixels' response and objections, (Dkt. 105-5).  Plaintiff did not number its facts, so citations refer to the pagination in Pixel's response.  In all instances, cited facts are not substantively disputed unless otherwise indicated.

Pixels does not select or upload images to its Websites.  (*Id.* ¶¶ 1.2–1.3.)  Instead, its contributors decide what to upload.  (*Id.*)  To do so, they must agree to Pixels' Contributors Terms of Use and guarantee that they are not infringing on third party copyrights.  (*Id.* ¶¶ 1.4–1.5.)  After uploading, contributors can tag their images with keywords and select products their images will be sold on.  (*Id.* ¶ 1.7; Broihier Depo. at 56.)  They can also choose to add digital watermarks—with the name of the Website—to the versions of their images that will be displayed online.  (Broihier Decl. ¶ 13.)  Pixels sets the base price for each product, and the contributors set the markup that they will earn for each sale.  (Broihier Depo. at 55–57; CSF at 8.)  Pixels contracts with third-party vendors, or "fulfillment centers," that manufacture and ship the goods.  (SGD ¶¶ 1.8–1.10; Broihier Depo. at 138.)  It splits the base price with its vendors.  (Broihier Depo. at 55–57.)

Pixels facilitates, processes, and executes the sales.  On its Websites, consumers can search for images by keyword, review the available products for each image, place products in their virtual "shopping cart," and make purchases.  (*Id.* at 93–95, 110–16, 162–63.)  Pixels sends invoices to consumers, receives payments, transmits the orders to the vendors for production and shipping, pays the markup price to the contributor, pays a portion of the base price to its vendors, and retains the profit.  (*Id.*)  When an order is submitted, a Pixels employee confirms that the image will not appear blurry on the purchased product and cancels and refunds the order if the image quality is not suitable for printing.  (*Id.* at 115; CSF at 4; Dkt. 94-2 [Declaration of Sean Broihier, hereinafter "Broihier Decl."] ¶ 19.)  Otherwise, Pixels maintains that its system is "fully automated." (*See* Broihier Decl. ¶ 19.)  Pixels has a designated agent for DMCA takedown notifications and systems in place to remove infringing images and disable accounts of repeat infringers.  (Broihier Decl. ¶¶ 21–23.)

The six images at issue in this case are photographs taken in the 1950's, '60s, and

'70s by Sid Avery, a well-known Hollywood photographer.  (CSF at 20–21.)[3]  They feature iconic celebrities: Frank Sinatra, James Dean, Steve McQueen, and the cast of the 1960 film *Ocean's Eleven*.  (*Id.*)  According to Plaintiff, "[l]imited edition prints of the images . . . can sell for thousands of dollars each, and [Plaintiff] licenses the images on a rights managed basis to the media and others."  (Dkt. 101-1 [Declaration of Andrew Howick, hereinafter "Howick Decl."] ¶ 2.)  In 1976, 2004, and 2014, representatives for Plaintiff applied for and received copyright registrations for the six images—Registration Numbers VAu 637-771, VAu 1-179-990, Ju 14776, and Ju 14671.  (CSF at 20–22.)  The copyrights are now held by Plaintiff, a company founded by Sid Avery.  (*See* FAC ¶¶ 2, 15.)  Pixels claims that three of these four copyrights are invalid and unenforceable because the claimants submitted false information to the Copyright Office.  (*See* SGD at 41–58.)

In the FAC, Plaintiff alleges that Pixels copied and distributed the six images without permission.  (FAC ¶¶ 18–21.)  Pixels concedes that it has sold at least one product displaying one of the images.  (Broihier Depo at 152; Broihier Decl. ¶ 34.)[4]  Plaintiff filed this action on December 10, 2018.  (Dkt. 1.)  It did not submit a DMCA notice to Pixels regarding any of the images at issue.  (SGD ¶ 2.b.1.)  Upon receiving the original Complaint and FAC, Pixels responded as if it had received a DMCA-compliant notice and removed the images containing the alleged infringement from the Websites. (*Id.* ¶ 2.b.2.)  In the operative FAC, Plaintiff asserts three claims for (1) direct and vicarious copyright infringement, 17 U.S.C. § 501, (2) removal of copyright management information, 17 U.S.C. § 1202, and (3) falsification of copyright management information, 17 U.S.C. § 1202(a).

---

[3] The FAC asserts claims related to eleven images, but Plaintiff has withdrawn its claims for five of them—Figures 4, 5, 6, 7, and 8 in Exhibit 1 to the FAC.  (*See* FAC ¶ 12; Dkt. 54 [Order Granting Joint Notice of Withdrawal].)

[4] Pixels maintains that it has only sold one single product displaying an image identified in the FAC. (Broihier Decl. ¶ 34.)  It claims that the sale was for $114.05, with a profit of $42.93.  (*Id.*)

### III.   LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a). Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 325.  A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" when its resolution might affect the outcome of the suit under the governing law, and is determined by looking to the substantive law.  *Id.*  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 249.

Where the movant will bear the burden of proof on an issue at trial, the movant "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In contrast, where the nonmovant will have the burden of proof on an issue at trial, the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim or defense, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–60 (1970), or (2) showing that there is an absence of evidence to support the nonmoving party's case, *Celotex*, 477 U.S. at 325.  Once this burden is met, the party resisting the motion must set forth, by affidavit or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256. A party opposing summary judgment must support its assertion that a material fact is genuinely disputed by (1) citing to materials in the record, (2) showing the moving

party's materials are inadequate to establish an absence of genuine dispute, or (3)

showing that the moving party lacks admissible evidence to support its factual position.

Fed. R. Civ. P. 56(c)(1)(A)–(B).

In considering a motion for summary judgment, the court must examine all the

evidence in the light most favorable to the nonmoving party, and draw all justifiable

inferences in its favor. *Id.*; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *T.W.*

*Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).

The court does not make credibility determinations, nor does it weigh conflicting

evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

But conclusory and speculative testimony in affidavits and moving papers is insufficient

to raise triable issues of fact and defeat summary judgment. *Thornhill Publ'g Co. v. GTE*

*Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## IV.   ANALYSIS

Pixels seeks summary judgment based on Plaintiff's lack of evidence and its own

affirmative defense.[5]  First, Pixels argues that there is no genuine dispute of material fact

as to its direct liability for copyright infringement because Plaintiff cannot establish that

it engaged in volitional conduct.  It mounts a similar challenge to Plaintiff's copyright

management information claims.  Second, Pixels claims that it is protected from

vicarious liability for copyright infringement under the DMCA's safe harbor provision.

Pixels also challenges the validity of three of the four copyright registrations at issue, and

---

[5] In its Objection to Plaintiff's Counterstatement of Facts, Pixels raises several evidentiary objections. (*See* Dkt. 105-5.)  Most of its objections challenge "misrepresentations" of the evidentiary record in the Counterstatement.  (*See id.*)  For disputed facts, the Court relies on the underlying evidence and not Plaintiff's characterization of that evidence.  Accordingly, these objections are overruled as moot. Pixels also challenges the authentication and foundation of various pieces of evidence lodged in support of Plaintiff's opposition—for example, printouts of webpages and emails.  (*See id.* at 12, 14–15.) Because the Court does not rely on this evidence, these objections are also overruled as moot.

finally, argues that any damages for copyright infringement should be limited based on Plaintiff's failure to produce evidence of willful infringement.  The Court grants Pixels' motion as to Plaintiff's copyright management information claims, and denies it on the remaining issues and claims.

### A.      Direct Liability for Copyright Infringement

In its first cause of action, Plaintiff seeks to hold Pixels liable for both direct and vicarious copyright infringement under 17 U.S.C. § 501.  (FAC ¶¶ 27–34.)  To prove direct copyright infringement, a plaintiff must show (1) "ownership of the allegedly infringed material," (2) defendant "violate[d] at least one exclusive right granted to" plaintiff under 17 U.S.C. § 106, and (3) causation.  *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir.) (internal quotations omitted), *cert. denied*, 140 S. Ct. 122 (2019). Pixels argues that there is no genuine dispute of material fact as to causation, commonly referred to as the "volitional-conduct requirement."  *See id.*  The Court disagrees.

"[V]olition in this context does not really mean an act of willing or choosing or an act of deciding."  *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017) (citations omitted).  Instead, "it simply stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts."  *Id.*  In copyright actions, "direct liability must be premised on conduct that can reasonably be described as the direct cause of the infringement."  *Id.* (citation omitted).  "This prerequisite takes on greater importance in cases involving automated systems."  *VHT*, 918 F.3d at 731.  "[D]irect copyright liability for website owners arises when they are actively involved in the infringement."  *Id.* at 732.  The traditional metaphor imagines a print shop that makes a copy machine available for public use at a fixed rate and allows customers to operate the machine themselves.  *See CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004).  "When a customer duplicates

an infringing work, the owner of the copy machine is not considered a direct infringer."
*Id.*  By contrast, if a copy shop works with a professor to print and sell "course packets"
with infringing material to students, it engages in volitional conduct.  *See Cartoon
Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131–32 (2d Cir. 2008)
(discussing *Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1383–
84 (6th Cir. 1996)).  Applying this distinction, the Ninth Circuit explains that "automatic
copying, storage, and transmission of copyrighted materials, when instigated by others,
do not render an Internet service provider strictly liable for copyright infringement."
*VHT*, 918 F.3d at 732 (quotations omitted and cleaned up).  Instead, to establish
volitional conduct, a plaintiff "must provide some evidence showing the alleged infringer
exercised control (other than by general operation of its website); selected any material
for upload, download, transmission, or storage; or instigated any copying, storage, or
distribution of [the] photos."  *Id.* (cleaned up).

It is undisputed that Pixels does not select or upload images to its Websites.  (SGD
¶¶ 1.2–1.3.)  Although it reviews images tagged with certain keywords for pornographic
content, this kind of screening does not establish control over user content.  *See Ventura
Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 613 (9th Cir. 2018) (holding that service
providers removal of content that violates terms of use does not establish control).  The
issue is whether Pixels' subsequent role in marketing, manufacturing, and distributing
infringing products involves "volitional" conduct—in other words, whether it resembles
the copy shop selling infringing course packets to students.  *See Princeton Univ. Press*,
99 F.3d at 1383–84.  Plaintiff asserts that, during these steps, Pixels' role is *not* passive
because it uses targeted advertising and controls the manufacturing and distribution of
products.  (*See* Dkt. 101 [Opposition, hereinafter "Opp."] at 15.)  The Court finds that
there are genuine disputes of material fact on this issue.

Pixels argues that it does not engage in volitional conduct at these stages because (1) its processes are fully automated and (2) it contracts out manufacturing and shipping to third party vendors. (*See* Mot. at 5–6.) The Court is not persuaded. First, Pixels admits that, after every purchase, an individual employee "confirms on a computer screen that the image will not appear blurry on the product purchased." (Broihier Decl. ¶ 19.) If there are issues with the image, the company cancels and refunds the order. (Broihier Depo. at 115; CSF at 4.) If not, "Pixels' automated process then directs the image, merchandise, and customer information to an independent vendor with which Pixels has contracted." (Broihier Decl. ¶ 19.) In other words, an individual employee reviews every image for every order. (*Id.*) This human touch suggests that Pixels' transmission of images to its vendors may not be truly "automatic." *Cf. Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 742 (S.D.N.Y. 2012) (finding no volitional conduct because "[t]here is no dispute that any reproduction, display or transmission of the Plaintiff's images by or through the KODAK Gallery website is an automated process with no human intervention by any employee of the Kodak Defendants"), *aff'd*, 569 Fed. App'x 51 (2d Cir. 2014).

Pixels next asserts that, because it contracts with third party vendors to manufacture and ship its products, it cannot be responsible for any volitional conduct during these steps. (*See* Mot. at 6.) The Court disagrees. Pixels claims that it is not "affiliated" with any of its vendors, but offers very few details about its relationship with them. (*See* Broihier Decl. ¶ 19.) It simply explains that the vendors receive some portion of the base price for each product and, in exchange, manufacture and ship the products. (*See id.*) In *Mavrix Photographs, LLC v. Livejournal, Inc.*, the Ninth Circuit explained that common law principles of agency determine whether an internet service provider is responsible for the actions of possible agents. 873 F.3d 1045, 1053 (9th Cir. 2017). "An agency relationship may be created through actual or apparent authority" and depends primarily "on the level of control a principal exerts over the agent." *Id.* at

1054–56.  In *Mavrix*, the Ninth Circuit concluded that there were genuine issues of material fact as to whether the defendant, a social media platform, could be responsible for the actions of unpaid "moderators," who screened content for user-created communities.  *See id.*  If these volunteers can act as the agents of a social media platform, it bears reason that Pixels' vendors—who have a formal, contractual relationship with Pixels—may act as Pixels' agents.

Indeed, the vendors apparently manufacture and ship goods based on information they receive from Pixels.  (*See* Broihier Decl. ¶ 19.)  Pixels has not offered any other details about the degree of control it exercises over its vendors.  It does, however, concede that at least one vendor used the name of an entity affiliated with Pixels, "Sean Broihier and Associates, LLC," on invoices and return addresses.  (*Id.*)  There is also evidence that pillows manufactured by a Pixels' vendor bear the "Pixels" label.  (*See* Howick Decl. ¶¶ 13–17; Dkt. 101-9.)  This is sufficient to create a genuine issue of material fact as to whether the vendors act as Pixels' agents based on apparent or actual authority.  *See Mavrix*, 873 F.3d at 1054–56.  Because Pixels offers no information about how its vendors operate, the Court cannot assess whether their processes are automated or involve volitional conduct.  *See Giganews*, 847 F.3d at 666.  Based on this uncertainty and Pixels' active participation in quality control, the Court finds that there are genuine issue of material fact as to whether it engage in volitional conduct.  *See VHT*, 918 F.3d at 732.[6]

//

//

---

[6] The Court is also skeptical that that "automation" is a panacea when the infringing conduct is manufacturing and distributing consumer goods, as opposed to facilitating electronic access to user-generated content.  Pixels does more than just copy, store, and transit images—it causes them to be printed on knickknacks sold to consumers.  *See Greg Young Publishing, Inc. v. Zazzle, Inc.*, 2017 WL 2729584, at *8 (C.D. Cal. May 1, 2017) (holding that because the defendant "created" the products at issue it was not dispositive that its production process was "effectively automatic").

## B.     Vicarious Liability for Copyright Infringement

Pixels' affirmative defense fails for similar reasons.   It argues that, as a matter of law, it is shielded from vicarious liability under the DMCA's safe harbor provision.  The Court finds that Pixels cannot make this showing.  Congress enacted the safe harbor provision of the DMCA, the Online Copyright Infringement Liability Limitation Act ("OCILLA"), to address "[d]ifficult and controversial questions of copyright liability in the online world."  *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).  Congress established a mechanism whereby copyright owners can notify online service providers of infringing material, and the service provider must remove or disable access to the material—the "notice and take down" procedure.  *See* 17 U.S.C. § 512(c)(1), (3). Service providers that follow these procedures are afforded safe harbors for certain kinds of conduct.  *See id.* § 512(c).  Congress endeavored to create "strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment."  *Rossi v. Motion Picture Ass'n of Am., Inc.*, 391 F.3d 1000, 1003 (9th Cir. 2004) (quoting H.R. Rep. No. 105-551, pt. 2, at 49 (1998)).

At issue here is 17 U.S.C. § 512(c), which protects service providers from liability for "infringement of copyright by reason of the storage at the direction of a user of material that resides" on the provider's system or network, if certain requirements are met.  17 U.S.C. § 512(c)(1).  These requirements are that the service provider:

> **(A)(i)** does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
>
> **(ii)** in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

**(iii)** upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

**(B)** does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

**(C)** upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1)(A)–(C).[7]

Pixels has the burden of affirmatively demonstrating each element of this affirmative defense and showing that any "reasonable trier of fact" would rule in its favor. *See Soremekun*, 509 F.3d at 984. The first three elements are undisputed. Pixels has presented evidence that it did not have notice of the infringing material until after Plaintiff filed suit and it acted expeditiously thereafter. (*See* Broihier Decl. ¶¶ 25–28.) Plaintiff does not dispute this evidence, nor does it argue that Pixels had constructive or "red flag" notice of the infringement. (*See* SGD ¶¶ 2.b.1–3); *see also* 17 U.S.C. § 512(c)(1)(A)(ii). Instead, the issue is whether Pixels is disqualified from safe harbor because it receives a direct financial benefit from the infringing activity and has the right and ability to control the infringing activity. *See* 17 U.S.C. § 512(c)(1)(B).

A service provider has the "right and ability to control" infringing conduct if it "exert[s] substantial influence on the activities of users." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1030 (9th Cir. 2013) (quoting *Viacom*

---

[7] The service provider must also have a designated agent to receive notifications of claimed infringement, 17 U.S.C. § 512(c)(2), and have adopted and reasonably implemented a policy that provides for the termination of "repeat infringers" and does not interfere with standard technical measures, 15 U.S.C. § 512(i). Pixels has presented uncontested evidence that it satisfies these requirements, and Plaintiff does not argue otherwise.

*Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 38 (2d Cir. 2012)).  This means "something more" than the ability to remove or block access to material, locate infringing material, or terminate users' access.  *Mavrix*, 873 F.3d at 1058.  "The service provider exerts high levels of control, for example, when it, prescreens sites, gives them extensive advice, prohibits the proliferation of identical sites, provides detailed instructions regarding issues of layout, appearance, and content, and ensures that celebrity images do not oversaturate the content."  *Id.* (cleaned up).  Several district courts have held that online marketplaces like eBay and Amazon do not have the right and ability to control the sale of infringing material when they are not "actively involved in the listing, bidding, sale and delivery of any item offered for sale on its website."  *See Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1094 (C.D. Cal. 2001); *see also Hendrickson v. Amazon.com, Inc.*, 298 F. Supp. 2d 914, 918 (C.D. Cal. 2003).

The Court finds that there is a genuine dispute of material fact as to Pixels' right and ability to control the infringing conduct.  The evidence in the record suggests that, unlike eBay and Amazon, Pixels may have an active role in designing, listing, selling, manufacturing, and delivering products.  *Cf. Hendrickson v. eBay*, 165 F. Supp. 2d at 1094.  Amazon and eBay's third-party vendors make their own decisions about what kind of products to sell.  *See Hendrickson v. Amazon*, 298 F. Supp. 2d at 918.  They are "the actual seller[s]."  *Id.* at 915.  By contrast, Pixels' "fulfillment centers" apparently manufacture and ship products at Pixels' direction and based on Pixels' specifications.  (*See* Broihier Decl. ¶ 19.)  The evidence in the record suggests that Pixels—not its vendors—determine the menu of products that will be available on the Websites.  (*See id.*)  As discussed above, Pixels may be liable for the conduct of its vendors to the extent they acted under Pixel's actual or apparent authority.  *See Mavrix*, 873 F.3d at 1054–56.

To be sure, Pixels' contributors decide what images to upload, and Pixels' does not prescreen images.  (*See* Broihier Decl. ¶¶ 9–10.)  But, unlike cases involving social

media and file sharing platforms, the infringing conduct at issue here is not simply facilitating online access to copyrighted material.  *Cf. Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1044–46 (9th Cir. 2013) (considering whether peer-to-peer file sharing platform had ability to control infringing activity); *Mavrix*, 873 F.3d at 1059 (same for social media platform).  Instead, Pixels and its vendors use contributors' images to create products that are sold to consumers—transferring them from photographs to phone cases.  In so doing, they may exercise control over user-generated content.  *See Zazzle, Inc.*, 2017 WL 2729584, at *8 ("If Zazzle lacks the right and ability to control the sale of products it creates, it is hard to imagine any defendant that would have such a right.")  Calling one's business a "platform" is not a magic wand.  Under similar facts, at least two district courts have concluded that similar print-on-demand platforms may have the right and ability to control infringing conduct.  *See id.*; *Gardner*, 2014 WL 794216, at *8–9).  As discussed above, there are genuine disputes of material fact as to Pixels' control over its vendors and, ultimately, its role in selling, pricing, manufacturing, inspecting, packaging, and delivering the infringing products.  Accordingly, there are genuine issues of material fact as to whether Pixels has the right and ability to control the infringing conduct.

The Court also finds that Pixels cannot meet its burden of establishing that it does not receive a financial benefit from the infringing conduct.  "[A] service provider receives a direct financial benefit from infringing activity where 'there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits.'"  *Fung*, 710 F.3d at 1044 (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004)).  Pixels urges the Court to apply the Ninth Circuit's analysis in cases involving subscription-based websites, file sharing networks, and social media platforms. (*See* Mot. at 10–11 [*citing Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004); *Fung*, 710 F.3d at 1044].)  In those cases, the Ninth Circuit explained that the relevant

inquiry is "whether the infringing activity constitutes a draw for subscribers, not just an added benefit." *Robertson*, 357 F.3d at 1079; *see also Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117–18 (9th Cir. 2007) (applying the same test).

"In determining whether the financial benefit criterion is satisfied, courts should take a common-sense, fact-based approach, not a formalistic one." S. Rep. No. 105-190, at 44 (1998). It would defy common sense to apply the Ninth Circuit's "draw-for-subscribers" analysis to a website that does not have subscribers and earns revenue from selling products, not advertising. For example, in *Fung*, the Ninth Circuit explained that the amount of infringing material on the service provider's websites supported the inference that its "revenue stream is predicated on the broad availability of infringing materials for [its] users, thereby attracting advertisers." 710 F.3d at 1045. This analysis simply does not fit here. Pixels does not sell any advertising on any of its Websites. (Broihier Decl. ¶ 16.) Accordingly, drawing visitors has no direct impact on revenue. *Cf. Fung*, 710 F.3d at 1045. Instead Pixels earns revenue from the sale of its products. (Broihier Decl. ¶ 15.) Pixels concedes that it has sold at least one product with one of the six images and earned a profit of $42.93 from that sale. (*Id.* ¶ 34.) Accordingly, there is a "causal relationship" between the infringing activity—manufacturing and selling a product—and the financial benefit. *See Fung*, 710 F.3d at 1044. The fact that this benefit is insubstantial compared to Pixels' overall profits is not dispositive. *Id.*

Ultimately, there are genuine issues of material fact as to whether Pixels has the right and ability to control the infringing activity, and Pixels cannot establish that any reasonable jury would find that it does not receives a direct financial benefit. *See* 17 U.S.C. § 512(c)(1)(B). Accordingly, it cannot establish that it is shielded from liability under § 512(c) at this stage.

//

## C.     Removal of Copyright Management Information

Pixels argues that there is no genuine issue of material fact as to Plaintiff's second claim for removing copyright management information ("CMI") in violation of 17 U.S.C. § 1202(b).  It has presented evidence that it did not remove any CMI from any of the images at issue in this case.  (*See* Broihier Decl. ¶ 33.)  In its opposition, Plaintiff "concedes that discovery has not revealed facts to support its claim for removal of copyright management information."  Accordingly, Pixels' motion for summary judgment is **GRANTED** as to this claim.

## D.     Falsification of Copyright Management Information

Pixels also argues that there is no genuine issue of material fact as to Plaintiff's third claim for falsifying CMI in violation of 17 U.S.C. § 1202(a).  To establish liability under § 1202(a), Plaintiff must show that Pixels "knowingly and with the intent to induce, enable, facilitate, or conceal infringement" either (1) "provide[d] copyright management information that is false," or (2) "distribute[d] or import[ed] for distribution copyright management information that is false."  17 U.S.C. § 1202(a).  Plaintiff's theory is that Pixels' Websites allowed a contributor to put the "Fine Art America" watermark on its copyrighted images.  (*See* Opp. at 15–16.)  Pixels argues that Plaintiff has no evidence to support its claim that Pixels acted knowingly or with intent "to induce, enable, facilitate, or conceal infringement."  *See* 17 U.S.C. § 1202(a).  The Court agrees.

 "Summary judgment is generally inappropriate when mental state is an issue, unless no reasonable inference supports the adverse party's claim."  *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984).  "A plaintiff, however, must offer more than conclusory allegations, and if the defendant presents affidavits or other evidence establishing a lack of scienter, the plaintiff must come

-16-

forward with some affirmative showing." *Id.*  Assuming, for the sake of argument, that Pixels could be liable for helping a contributor place the "Fine Art America" watermark on the images at issue, there is no reasonable inference that Pixels acted with the requisite intent or knowledge.  Pixels does not require or even encourage contributors to use watermarks.  (*See* Broihier Depo. at 27.)  In fact, it warns them that "[w]atermarks may confuse buyers and discourage them from purchasing your artwork."  (*See* Dkt. 105-5.)  Pixels allows contributors to watermark their images to address concerns about viewers downloading images from the Websites without permission.  (Broihier Decl. ¶ 13.)  Moreover, Plaintiff concedes, based on Pixels' undisputed evidence, that Pixels lacked actual or constructive notice that the six images at issue here infringed on Plaintiff's copyrights.  (*See* SGD ¶¶ 2.b.1–3.)  Nevertheless, it claims that Pixels' knowledge and intent to facilitate infringement can be inferred from Pixels' "possession" of the watermarked images.  (Opp. at 15.)  This inference is unreasonable and unsupported by any evidence in the record.  Because there is no genuine dispute of material fact as to Pixels' knowledge and intent to induce, enable, facilitate, or conceal infringement, Pixels' motion is **GRANTED** as to Plaintiff's § 1202(a) claim.

### E.    Validity of Copyrights

Pixels also seeks partial summary judgment as to four of the six images at issue on the grounds that the underlying copyright registrations are invalid and unenforceable. Specifically, it challenges the validity of Ju 14776 (the "1976 Registration"), VAu 637-771 (the "2004 Registration"), and VAu 1-179-990 (the "2014 Registration").  (Mot. at 3.)[8]  Generally, Pixels alleges that Plaintiff's representatives submitted inaccurate facts regarding these registrations to the Copyright Office.  The Court finds that questions of fact preclude summary judgment on this theory.

---

[8] Pixels does not challenge the validity of the Ju 14671 registration.

"Although copyright registration is 'not a condition of copyright protection,' registration is a precondition to filing an action for copyright infringement." *Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*, 925 F.3d 1140, 1144 (9th Cir. 2019) (citing 17 U.S.C. §§ 408(a), 411(a)), *cert. denied*, 140 S. Ct. 1294 (2020).  A copyright registration certificate "shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."  17 U.S.C. § 410(c).  A certificate of registration satisfies this requirement "regardless of whether the certificate contains any inaccurate information, unless (A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration."  17 U.S.C. § 411(b)(1).[9]

The 1909 Copyright Act ("1909 Act") governs the validity of three copyrights at issue because Sid Avery created them prior to 1978.  *See Self-Realization Fellowship Church v. Amanda Church of Self-Realization*, 206 F.3d 1322, 1325 (9th Cir. 2000). "Under the 1909 Act, an unpublished work was protected by state common law copyright from the moment of its creation until it was either published or until it received protection under the federal copyright scheme."  *ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, 688 (9th Cir. 2000) (quotation omitted). When a work was published, it lost common law protection, and the owner could only protect it by complying with the 1909 Act's requirements for registration.  *Id.*  Under § 9 of the 1909 Act, the creator secured copyright for his or her work by publishing "with the notice of copyright required by this title."  *Id.*  If the creator published the work *without* complying with these requirements,

---

[9] 17 U.S.C. § 411(b)(2) provides that, before a district court can invalidate a registration on the basis of material misrepresentations in the application, it must first obtain input from the Register of Copyrights as to whether the information would have caused it to refuse registration.  The court can, however, "demand that the party seeking invalidation first establish that the other preconditions to invalidity are satisfied before obtaining the Register's advice on materiality."  *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 625 (7th Cir. 2013).

the work entered the public domain.  *Id.*  The 1909 Act did, however, allow for the registration of "certain works . . . of which copies are not reproduced for sale," including photographs.  *See* 17 U.S.C. § 11 (1909 Act).

The parties agree that the images at issue were registered as unpublished photographs.  (*See* SGD ¶¶ 3.a.2, 3.b.4, 3.c.2.)  The issue is whether, in so doing, the claimants knowingly provided inaccurate information because the applications included images that had already been published.  *See* 17 U.S.C. § 411(b)(1)(A).  Although it held enormous significance, the act of "publication" was not defined in the 1909 Act, but shaped by existing and subsequent case law.  *See Am. Vitagraph, Inc. v. Levy*, 659 F.2d 1023, 1026–27 (9th Cir. 1981).  The leading treatise explains that, under the 1909 Act, "publication occurred when, by consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public, or when an authorized offer is made to dispose of the work in any such manner, even if a sale or other such disposition does not in fact occur."  1 Nimmer on Copyright § 4.03 (2019) (footnotes omitted).  However, under the 1909 Act, as today, courts generally distinguished between "general" and "limited publication," "holding that only the former operates to divest common law copyright and subject a work to the federal statutory scheme."  *Am. Vitagraph*, 659 F.2d at 1026–27.  "General publication has been stated to be such a dissemination of the work of art itself among the public, as to justify the belief that it took place with the intention of rendering such work common property."  *Id.* (quotation omitted).  By contrast:

> A limited publication 'communicates the contents of a [work] . . . to a definitely selected group and for a limited purpose, and without the right of diffusion, reproduction, distribution or sale . . . [and] does not result in loss of the author's common-law right to his [work]. . . . [T]he circulation must be restricted both as to persons and purpose, or it can not be called a private or limited publication.

*Id.* (*quoting White v. Kimmell*, 193 F.2d 744, 746–47 (9th Cir. 1952)) (alterations in original).

As relevant here, the 1976 Registration covers an image of the *Ocean's Eleven* cast, circa 1960. (*See* FAC Ex. 1 [Figure 9]; Dkt. 94-12 [Certificate of Registration for Ju 14776, hereinafter "1976 Registration"].) The application was submitted by Sid Avery and approved in 1976. (*Id.*) Pixels argues that the copyright is invalid and unenforceable because Sid Avery published the image before registering it as an unpublished image. Specifically, Pixels has presented evidence that Sammy Davis, Jr. acquired a print of the image around 1961. (*See* Dkt. 94-26 [Deposition of Ronald Avery, hereinafter "Avery Depo."] at 238–39.) However, neither side has presented evidence illuminating the details of this transaction. Ron Avery testifies that—at most— this would have been a singular gift to a friend, with explicit or implicit instructions limiting how Mr. Davis could use or circulate the image. (*See id.*) Sharing the image in this way, "to a definitely selected group and for a limited purpose, and without the right of diffusion, reproduction, distribution or sale" would not qualify as general publication, and would be consistent with the subsequent application. *See Am. Vitagraph*, 659 F.2d at 1027 (quotation omitted). Accordingly, the Court finds that there are genuine issues of material fact as to whether Sid Avery provided false information in the application for the 1976 Registration.

As relevant here, the 2004 Registration covers two photographs of Frank Sinatra, circa 1954. (*See* FAC Ex. 1 [Figures 1–2]; Dkt. 94-13 [Certificate of Registration for VAu 637-771, hereinafter "2004 Registration"].) The application was submitted by Ron Avery on behalf of Plaintiff on April 7, 2004 and approved on May 14, 2004. (*Id.*) Similarly, the 2014 Registration covers one image of Frank Sinatra at a recording session, circa 1957. (*See* FAC Ex. 1 [Figure 3]; Dkt. 94-14 [Certificate of Registration for VAu 1-179-990, hereinafter "2014 Registration"].) The application was submitted by

Andrew Howick, Plaintiff's Director of Photography, on behalf of Plaintiff and approved on July 21, 2014.  (*Id.*)  Pixels argues that the applications for both registrations included false information because they included several images that had already been published. Specifically, Pixels argues that the 2004 and 2014 Registrations cover several images— not otherwise at issue in this case—used on record covers for Sinatra albums.  (*See* Avery Depo. at 58–59, 120.)  Plaintiff responds that when Ron Avery and Howick submitted the applications, they had no knowledge that the images had been previously published.  (*See id.* at 58–59, 61.)  Accordingly, the parties dispute whether the claimants submitted the applications with knowledge that they contained inaccurate information. *See* 17 U.S.C. § 411(b)(1).

Ron Avery and Howick knew that Sid Avery had taken photographs of Sinatra that were used as album art.  (Avery Depo. at 58–59; Dkt. 94-25 [Deposition of Andrew Howick, hereinafter "Howick Depo."] at 63, 162–73.)  According to Pixels, this kind of "general awareness" satisfies the knowledge requirement of § 411(b)(1).  (*See* Mot. at 21–22; Dkt. 105 [Reply] at 19 [citing *Gold Value Int'l Textile, Inc.*, 925 F.3d at 1147].) The Ninth Circuit has never announced such a rule, and it is not the law.  The case cited by Pixels never suggests a "general awareness" standard.  *See Gold Value Int'l Textile, Inc.*, 925 F.3d at 1147.  Indeed, the defendant in that case had *specific* knowledge that it had previously sold the textile designs at issue.  *Id.*  The Ninth Circuit explained that it was not dispositive that the defendant did not know that the sale constituted "publication."  *Id.*  However, it never implied that a "general awareness" of the *facts* underlying the publication was sufficient.  *See id.*  The plain language of the statute demands more than general awareness; it requires "knowledge" that certain information "was inaccurate."  *See* 17 U.S.C. § 411(b)(1).

Pixels also challenges the credibility of Howick and Ron Avery's testimony as to the 2014 Registration.  It argues that they must have known about the album artwork at

issue because their company published a book featuring the album covers two years before the 2014 application.  (*See* Avery Depo. at 58–59, 120; Howick Depo. at 63, 162–73.)  In general, "[c]redibility determinations are for the trier of fact and, therefore, are not appropriately resolved by summary judgment."  *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).  Pixels has a valid basis to challenge the witnesses' credibility, but the Court cannot resolve this factual issue at this stage.  Accordingly, the Court finds that there are genuine issues of material fact as to whether the applications included false information that the applicants knew to be false.

### F.    Damages

Finally, Pixels ask the Court to limit the scope of possible damages to $200 per image for Plaintiff's copyright claims.  17 U.S.C. § 504(c)(2) provides "[i]n a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200."  Infringement is not innocent if the defendant "had knowledge that its conduct represented infringement or . . . recklessly disregarded the possibility."  *Mango v. Buzzfeed, Inc.*, 356 F. Supp. 3d 368, 375 (S.D.N.Y. 2019) (quotation omitted).  As discussed above, Pixels has not presented any evidence addressing the operations of its vendors or its control over them.  Without this information, the Court declines to resolve this discretionary issue at the summary judgment stage.

Nevertheless, the Court is skeptical that Plaintiff will be able to support a claim for significant damages.  It is undisputed that Pixels responded promptly upon receiving notice of the infringing images.  Pixels' profits and Plaintiff's actual damages are apparently very modest—perhaps less than $100.  (*See* Broihier Decl. ¶ 34.)  The Court therefore strongly believes this case should settle.  The cost of continued litigation will

almost certainly outstrip the amount in controversy.  The Court encourages counsel on both sides to use their best efforts to resolve this dispute informally and to avoid wasting their clients' resources.

## V.    CONCLUSION

For the foregoing reasons, Pixels' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.  It is **GRANTED** as to Plaintiff's second and third claims for removal and modification of copyright management information, which are hereby dismissed.  It is **DENIED** as to Plaintiff's copyright infringement claim.

DATED:     August 18, 2020

_____

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE