FILED
CLERK, U.S. DISTRICT COURT

2/24/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___CW___ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SID AVERY AND ASSOCIATES, INC. d/b/a MPTV IMAGES,<br><br>Plaintiff,<br><br>v.<br><br>PIXELS.COM, LLC,<br><br>Defendant. | Case No.: CV 18-10232-CJC(JEMx)<br><br><br>MEMORANDUM OF DECISION<br><br>BENCH TRIAL<br>SUBMITTED 11/5/2020 |

## I. INTRODUCTION

This copyright case involves six photographs taken by photographer Sid Avery, whose rights are owned by Plaintiff Sid Avery and Associates, Inc., d/b/a MPTV Images ("MPTV"). During the 1950's and 60's, Sid Avery took iconic photographs of celebrities including Frank Sinatra, the Rat Pack, Paul Newman, Nat King Cole, Marlon Brando, and James Dean. MPTV contends that Defendant Pixels.com, LLC ("Pixels") infringed on its copyrights in Sid Avery's photographs.

In November 2020, the Court conducted a three-day bench trial. The parties thereafter submitted closing briefs. The Court issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) by this Memorandum of Decision. After carefully reviewing all the evidence, testimony, and arguments presented by the parties' counsel, the Court concludes that while MPTV has valid copyrights in the images at issue, it has not shown that Pixels copied original elements from the copyrighted works through volitional conduct. Additionally, Pixels is protected from monetary liability by the DMCA safe harbor.

## II. FACTUAL BACKGROUND

There are six Sid Avery photographs at issue in this case: "Ocean's Eleven," "Steve McQueen," "James Dean," "Frank Sinatra Turning," "Frank Sinatra Smoking," and "Frank Sinatra Snapping." Each were registered with the United States Copyright Office in collections of unpublished images. "Ocean's Eleven" was registered on October 15, 1976 under registration number Ju 14776. (Exs. 10, 15.) "Steve McQueen" and "James Dean" were registered on August 13, 1976 under registration number Ju 14671. (Exs. 11, 14.) "Frank Sinatra Turning" and "Frank Sinatra Snapping" were registered on May 14, 2004 under registration number VAu 637-771. (Exs. 12, 16.) "Frank Sinatra Smoking" was registered on July 21, 2014 under registration number VAu 1-179-990. (Exs. 13, 17.)

Pixels provides online marketplaces for artists or image rights holders ("Contributors") to sell their images. (Broihier Tr. vol. 3, 10:20–24, 11:19–22.)[1] Contributors upload images onto Pixels' website for customers to purchase as prints or printed on various products including apparel, coffee mugs, tote bags, and pillows.

---

[1] Trial testimony is cited as "[Witness Name] Tr. vol. #, pg. #: line #." The volume number reflects the day of the trial on which the witness testified.

1  Pixels has over 25 million images uploaded to its website and over 10,000 images are
2  added daily.  (*Id.* at 15:16–20.)  MPTV asserts that Pixels infringed on MPTV's
3  copyrights by offering the six photographs at issue for sale on its website.  As a result,
4  MPTV brought the instant action asserting claims of direct copyright infringement.

## III.  DIRECT COPYRIGHT INFRINGEMENT

To establish direct copyright infringement, MPTV must prove that (1) MPTV is the owner of valid copyrights, and (2) Pixels copied original elements from the alleged copyrighted works.  *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).

### A.  Validity of MPTV's Copyright Registrations

A copyright registration is "prima facie evidence of the validity of the copyright and the facts stated in the certificate."  17 U.S.C. § 410(c).  To rebut the presumption of validity, a defendant "must simply offer some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement."  *Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997).  A copyright registration is unenforceable if (1) inaccurate information was included on the application "with knowledge that it was inaccurate" and (2) "the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration."  17 U.S.C. § 411(b)(1).

"When one registers a collection of works in a single copyright, it can be registered either as a 'published' or an 'unpublished' collection."  *United Fabrics Intern., Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1259 (9th Cir. 2011) (citing 37 C.F.R. § 202.3(b)(4)). "The Copyright Office will not accept a group of published and unpublished works in a single registration."  *Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*, 925 F.3d

1140, 1145 (9th Cir. 2019) (citations omitted).  Here, each of the images at issue were registered with the Copyright Office in unpublished collections.

Pixels argues that the "Ocean's Eleven" copyright registration is invalid because a copy of the photograph was gifted to Sammy Davis, Jr. in the early 1960's, rendering it published at the time of registration. (Dkt. 151 [Pixels Closing Brief, hereinafter "Pixels' Br."] at 17; *see* Avery Tr. vol. 1, 73:1–4.)  Under the guidance applicable at the time "Ocean's Eleven" was registered, "general publication" is defined as "the act of making one or more copies of a work available to the general public, without express or implied restrictions as to future use, usually by means of a sale, an offering for sale, or a public distribution." Copyright Office, *Compendium of Copyright Office Practices* § 3.1.1.II (1973).  Examples of such publication include "sale of a single copy," "leaving copies in a public place for anyone to take," or "indiscriminate gifts of copies." *Id.* at § 3.1.1.III. Because Pixels has not shown that the gift to Sammy Davis Jr. was "indiscriminate," nor has it shown that there were multiple "gifts of copies."  The Court finds that "Ocean's Eleven" was not published when it was registered with the Copyright Office.

Pixels also argues that the copyright registrations covering "Sinatra Turning," "Sinatra Snapping," and "Sinatra Smoking" are invalid because other images in these images' collections were published prior to the collection's registration. (Pixels' Br. at 18–19.)  Pixels asserts that certain images included in these registrations were published as album or CD covers and in a 2012 Frank Sinatra Photobook published by MPTV.  (*Id.*) However, Pixels has not shown that any of the images *at issue* were published nor, perhaps more importantly, that MPTV knew that they were published at the time the images were registered with the Copyright Office.  Mr. Avery and Mr. Howick testified that they were not aware that images at issue may have been published before the copyright applications were filed. (*See, e.g.*, Avery Tr. vol. 1, 95:9–96:17, 107:2–110:7; Howick Tr. vol. 2, 97:24–98:2, 100:21–24.)  At best, the inclusion of published images in

MPTV's unpublished applications was done without the knowledge required to invalidate the registrations. *See* 17 U.S.C. § 411(b)(1)(a); *see also Gold Value*, 925 F.3d at 1146–47. Accordingly, MPTV owns valid copyrights in the images at issue.

### B. Copying of Original Elements

To prove direct copyright infringement, MPTV must also show that Pixels copied original elements from the copyrighted works through "volitional conduct." *See VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019). This volitional-conduct requirement "stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts." *Id.* (quoting *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017)). "[W]hile most direct-infringement cases do not present this issue, it comes right to the fore when a direct-infringement claim is lodged against a defendant who does nothing more than operate an automated, user-controlled system. . . . Most of the time [the issue of volitional conduct] will come down to who selects the copyrighted content: the defendant or its customers." *Id.* at 731–32 (quotation marks omitted) (quoting *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 537 U.S. 431, 454–55 (2014) (Scalia, J., dissenting)). In other words, to demonstrate volitional conduct, MPTV must provide "evidence showing [the alleged infringer] exercised control (other than by general operation of [its website]); selected any material for upload, download, transmission, or storage; or instigated any copying, storage, or distribution" of its photos. *Id.* at 732 (quotation marks omitted) (quoting *Giganews*, 847 F.3d at 670). MPTV has failed to make such a showing.

Pixels does not select the images to be uploaded to its websites, Contributors do. (Broihier Tr. vol. 3, 10:25–11:3.) Pixels does not direct what is bought, created, or sold. (*Id.* at 90:17–19.) Rather, Pixels controls only the code which facilitates transactions between vendors, Contributors, and buyers, not what images are uploaded onto its

service. (*Id.* at 90:21–91:3.) Pixels explicitly prohibits infringing content and has implemented a system to remove infringement and infringing Contributors as quickly as possible. (*Id.* at 23:8–24:7.) Indeed, Pixels has promptly removed images that MPTV alleged to be infringing during this action. (*Id.* at 117:23–119:2.)

In sum, MPTV has failed to show that Pixels caused the alleged infringement through its volitional conduct and its claims for direct copyright infringement must fail.

**IV. AFFIRMATIVE DEFENSE – DMCA SAFE HARBOR**

Pixels is also not liable for the monetary relief that MPTV seeks because of the DMCA safe harbor, 17 U.S.C. § 512(c). To establish this DMCA affirmative defense, Pixels must prove that it:

> (a) is a service provider of network communication services, online services or network access;
> (b) adopted, reasonably implemented and informed users of a policy to terminate users who are repeat copyright infringers;
> (c) accommodated and did not interfere with standard technical measures used to identify or protect copyrighted works;
> (d) designated an agent to receive notifications of claimed infringement, and made the agent's name, phone number and email address available on its website and to the Copyright Office;
> (e) is facing liability for copyright infringement based on information residing on the defendant's systems or networks at the direction of users;
> (f) lacked actual knowledge that the material or activity on the system or network was infringing;
> (g) was either (1) not aware of facts or circumstances from which specific infringing activity was apparent, or (2) upon obtaining knowledge or awareness or upon receiving a valid notification of claimed infringement, acted expeditiously to remove or disable access to the material; and
> (h) while having the right and ability to control the infringing activity, did not receive a financial benefit directly attributable to the infringing activity.

9th Cir. Manual of Model Civ. Jury Instructions § 17.30; *see also* 17 U.S.C. § 512(c), (i).

The critical element in this case is whether Pixels, "while having the right and ability to control the infringing activity, did not receive a financial benefit directly attributable to the infringing activity."[2] The right or ability to control infringing activity requires "something more than the ability to remove or block access to materials posted on a service provider's website." *UMG Recordings, Inc. v. Shelter Cap. Partners, LLC*, 718 F.3d 1006, 1030 (9th Cir. 2013). That "something more" exists where a service provider exerts "substantial influence on the activities of users," such as when the service provider is "actively involved in the listing, bidding, sale and delivery of items offered for sale . . . or otherwise controls vendor sales by previewing products prior to their listing, editing product descriptions, or suggesting prices." *Id.* (internal quotation marks omitted) (quoting *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 38 n.13 (2d Cir. 2012)); *see also Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1094 (C.D. Cal. 2001) (service provider may be found to have "the right and ability to control" the sale of infringing content if it was "actively involved in the listing, bidding, sale and delivery of any item offered for sale on its website"); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1110 (W.D. Wash. 2004) (service provider may "have the right or ability to control vendor sales" when it is "in possession of the products sold by [its users]" or if it "preview[ed] the products prior to their listing, . . . edit[ed] the product descriptions, . . . suggest[ed] prices, . . . or otherwise involve[d] itself in the sale").

---

[2] Parties stipulated that Pixels satisfied elements (a)–(b), and (d)–(g). (Dkt. 125-1 [Pretrial Order] at 2–3; *see also* Pixels Br. at 20.) Broihier's uncontroverted testimony at trial establishes element (c). (*See* Broihier Tr. vol. 3, 22:19–23:10.)

The testimonial evidence presented at trial establishes that Pixels did not exert substantial influence on its Contributors' sales activities. While over 700,000 Contributors have uploaded over 25 million images to the Pixels websites, (Broihier Tr. vol. 3, 15:11–18), Pixels does not encourage or incentivize the uploading of any particular content, (*id.* at 12:8–12). Contributors can upload whatever images they choose—barring images that incite violence, promote racism, or contain pornographic material—if they represent and warrant to Pixels that they own the rights in the uploaded images. (*Id.* at 17:19–18:3.) If a Contributor represents and warrants that he or she has rights in the images uploaded to Pixels, those images instantly appear on the website. (*Id.* at 15:14–16.) Pixels does not alter any uploaded images, nor is it involved with describing or classifying the images on its website. (*Id.* at 21:2–11.) The Contributor is responsible for describing or classifying their images. (*Id.* at 21:12–21.)

MPTV argues that Pixels has the right and ability to control the infringing activity because it "controls the Websites, what can be sold on the Websites, and the minimum prices of those items." (Dkt. 150 [MPTV Closing Brief] at 22.) However, Pixels' "right and ability to control its system does not equate to the right and ability to control infringing activity." *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1131, 1154 (N.D. Cal. Aug. 27, 2008). The fact that Pixels processes payments, transmits order information to manufacturers, or updates its code to set minimum pricing or add new items, (Broihier Tr. vol. 3, 33:14–34:22, 89:24–90:3, 96:7–98:6), shows only that it controls its operations as a service provider, not the infringing activity. Pixels does not encourage the final pricing or product selection set by Contributors, nor is it substantially involved with any individual sale. While Pixels is in contract with the manufacturers who produce the goods sold, (*id.* at 86:4–6), Pixels has no control over the employees, materials,

prices, or products that manufacturers make or how they are labeled or shipped, (*id.* at 42:15–16, 42:23–43:10, 52:13–29). Rather, Pixels' only involvement in a sales transaction occurs when a Pixels employee inspects a print for pixilation or cropping issues.[3] (*Id.* at 36:2–11.) That employee spends only seconds inspecting "a zoomed-in, very high-resolution view of the top left corner, the top right corner, the bottom left corner, and bottom right corner of the image that was ordered." (*Id.* at 36:19–20, 37:16–20.) These actions do not reflect the "substantial influence on the activities of users" required to have a right and ability to control the infringing activity. *See UMG Recordings*, 718 F.3d at 1030.[4]

While the DMCA's safe harbor does not completely immunize qualified service providers from liability, it does "protect eligible service providers from all monetary and most equitable relief that may arise from copyright liability." *See Corbis Corp.*, 351 F. Supp. 2d at 1098–99. Because Pixels qualifies for safe harbor under § 512(c), the only relief available to MVPT is the limited injunctive relief pursuant to § 512(j). Once Pixels received notice of the infringing images through MPTV's complaint, however, Pixels treated the pleadings as takedown notices and immediately removed the images identified. (Broihier Tr. vol.3, 117:23–119:2.) Accordingly, any injunctive relief to which MPTV would be entitled is now moot.

//

---

[3] Pixels inspects only images sold as prints, not images printed on items. (Broihier Tr. vol. 3, 68:9–15.)

[4] Because Pixels does not have the right and ability to control the alleged infringing activity, the Court need not engage in the "financial benefit analysis" to conclude that Pixels is entitled to the DMCA's safe harbor protection. *See Tur v. YouTube, Inc.*, 2007 WL 1893635, at *3 (C.D. Cal. June 20, 2007) (quoting 17 U.S.C. § 512(c)(1)(B)) ("As the statute makes clear, a provider's receipt of a financial benefit is only implicated where the provider also 'has the right and ability to control the infringing activity.'").

## V. CONCLUSION

The Court finds in favor of Pixels. Despite the validity of MPTV's copyright registrations, MPTV failed to show that Pixels copied original elements from the copyrighted works through volitional conduct. Additionally, Pixels established that it is protected by the DMCA safe harbor provision for service providers and any injunctive relief to which MPTV would be entitled is moot. A judgment consistent with this memorandum of decision shall issue concurrently herewith.

DATED: February 24, 2021

HON. CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE